**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| Ann Seyboldt,<br>        Plaintiff,<br><br>        v.<br><br>Linde, Inc., et al.,<br>        Defendants. | No. 3:23-cv-00209 (SRU) |

## <u>ORDER ON DEFENDANTS' MOTION TO DISMISS</u>

The Plaintiff, Ann Seyboldt, alleges that she was improperly denied pension plan benefits that were owed to her from December 1999 to December 2003.  She claims that she has participated in the pension plan as an employee of Linde, Inc. (formerly Praxair, Inc.) (collectively, the "Company") since December 1999, when she first began performing services for the Company.  Her Amended Complaint raises seven ERISA claims against the Company, the Linde U.S. Pension Plan (the "Plan"), and the Administration and Investment Committee for the Linde U.S. Retirement Plans (the "Committee") (collectively, "Defendants").  *See* Am. Compl., Doc. No. 54.

The Defendants subsequently filed a motion to dismiss all seven of Seyboldt's ERISA claims, as well as to dismiss the Company as a party.  *See* Defs.' Mot. to Dismiss, Doc. No. 57. Seyboldt is not contesting the dismissal of the Company from the suit or the dismissal of Counts Four, Five, and Six of her Amended Complaint.  *See* Pl.'s Notice Re Defs.' Mot. to Dismiss, Doc. No. 72.

For the following reasons, Defendants' Motion to Dismiss, Doc. No. 57, is **DENIED** with respect to Counts One, Two, Three, and Seven, and **GRANTED** with respect to Counts Four, Five, and Six.  The Defendants' Motion to Dismiss the Company from the lawsuit is also **GRANTED**.

## I.   Background

The following facts are alleged in the Amended Complaint and are treated as true for purposes of the motion to dismiss.

### 1.   *The 1998 Plan and the 2002 Amendment*

The Company's 1998 Plan sets out eligibility requirements for individuals to receive pension benefits from the Company.  Namely, it provides that, unless specifically excluded under section 2.5, "an Employee of an Employer shall participate in the Plan immediately upon such Employee's Date of Hire."  *See* Ex. A to Am. Compl., Doc. No. 54-1, at 23.  "Date of Hire" refers to "the date on which an Employee first performs an Hour of Service for an Employer."  *Id*. at 11.  "Employee" refers to "any individual, who, under the rules applicable in determining the employer-employee relationship for purposes of [Internal Revenue] Code section 3121, has the status of an employee of an Employer or an Affilitate[.]"  *Id*. at 14.  Internal Revenue Code section 3121 in turn embraces the common law rules for determining whether an employee-employer relationship exists.  *See* 26 U.S.C. § 3121(d)(2).

Section 2.5 of the 1998 Plan lists several categories of individuals excluded from participation in the Plan.  *See* Ex. A to Am. Compl., Doc. No. 54-1, at 23-25.  For instance, section 2.5(e) excludes individuals "who are considered by an Employer to be independent contractors," even if they are "determined for any other purpose to be employees of an Employer," *id*. at 25, and section 2.5(d) excludes "[i]ndividuals who perform services for an Employer as Leased Employees."  *Id*. at 24.  There appear to be distinct mechanisms for assessing if one is an independent contractor or a leased employee.  Whereas section 2.5(e)—the independent contractor exclusion—states that "[t]he characterization on the books and records of

an Employer (if any) shall be conclusive of the individual's status for purposes of the Plan," *id*. at 25, section 2.5(d) defines leased employees more specifically.[1]  *Id*. at 24-25.

The Company amended the Plan in 2002 to change its method of calculating pension benefits.  Whereas the 1998 Plan contained "legacy provisions" that determined pension benefits based on a participant's final average earnings, the 2002 amendment added a new method of calculating benefits.  Am. Compl., Doc. No. 54, ¶ 76.  That new method—termed the Account-Based Design—calculated a participant's pension earnings by taking a percentage of the participant's pensionable earnings.  Defs.' Mem. of Law in Supp. of Mot. to Dismiss, Doc. No. 57-1, at 3.  Existing participants—*i.e.*, those already part of the Plan prior to April 30, 2002— were given the option to either remain with the means of calculation described under the legacy provisions or to join the Account-Based Design.  Am. Compl., Doc. No. 54, ¶ 77.  New participants—*i.e.*, those who entered the Plan after April 30, 2002—were automatically enrolled in the Account-Based Design and were not given an opportunity to benefit from the legacy provisions.  *Id*. ¶ 79.

2. *Ann Seyboldt*

Ann Seyboldt has worked for the Company at its New York location since December

---

[1] Section 2.5(d) provides that a Leased Employee is any person, "other than an Employee of the Employer," who, subject to other conditions and "pursuant to an agreement between an Employer and any other person (the "leasing organization"), has performed services for an Employer . . . on a substantially full-time basis for a period of at least one year if such services are performed under the primary direction or control of an Employer[.]"  Ex. A. to Am. Compl., Doc. No. 54-1, at 24.  The same section references Internal Revenue Code section 414(n), which defines Leased Employee as "any person who is not an employee of the recipient and who provides services to the recipient if—(A) such services are provided pursuant to an agreement between the recipient and any other person (in this subsection referred to as the 'leasing organization'), (B) such person has performed such services for the recipient (or for the recipient and related persons) on a substantially full-time basis for a period of at least 1 year, and (C) such services are performed under primary direction or control by the recipient."  26 U.S.C. § 414(n)(2).

1999, when she began providing services to the Company via a contract between the Company and Kelly Services, Inc. ("Kelly"), a third-party employment agency. *Id*. ¶¶ 9-10. On December 15, 2003, the Company hired Seyboldt directly and placed her on its payroll. *Id*. ¶ 12.

The Defendants do not contest that, as an employee of Linde, Seyboldt has been a participant in the Plan since December 15, 2003, the date of her direct hire. Defs.' Mem. of Law in Supp. of Mot. to Dismiss, Doc. No. 57-1, at 4. However, Seyboldt alleges that, at all times since December 1999, she has been a common-law employee of the Company.[2] Am. Compl., Doc. No. 54, ¶ 11. Consequently, she claims that she was eligible to participate in the Plan between December 1999 and December 15, 2003, and that she should have been given the option to choose between the legacy provisions and Account-Based Design when the Plan was amended in 2002. *Id*. ¶¶ 74, 80. Seyboldt alleges that she did not know that the 1998 Plan was amended in 2002. *Id*. ¶ 30.

She also claims that, prior to her direct hire on December 15, 2003, she never received from the Defendants any documents that would have put her on notice that, as a common law employee, she was eligible to participate in the legacy provisions. *Id*. ¶ 32. The first relevant document she received—a 2003 Summary Plan Description for the Plan's Account-Based Design ("2003 SPD")—was only sent to her after her direct hire in December 2003. *Id*. ¶ 33. The 2003 SPD explains that one is "not eligible to participate in the Plan if [they] are . . . characterized as a leased employee or independent contractor on [the Company's] books." *Id*. ¶ 34.

In March 2016, Seyboldt emailed her HR manager to ask if her service from 1999 to 2003 would be counted in her service credit. Defs.' Mem. of Law in Supp. of Mot. to Dismiss,

---

[2] The Defendants do not address whether Seyboldt was a leased employee or a common-law employee from December 1999 to December 15, 2003.

Doc. No. 57-1, at 5; Ex. K to Am. Compl., Doc. No. 54-11, at 2.  In May 2019, Seyboldt again emailed the Company's HR Department to ask how the Company calculated her service credits. Am. Compl., Doc. No. 54, ¶ 36.  The Company responded in January 2020 by informing her for the first time that her inquiries were being treated as a claim for benefits.  *Id.* ¶ 37.  Two months later—in March 2020—the Company, as Claims Administrator for initial decisions under the Plan, denied Seyboldt's request to have December 1999 to December 2003 included in her service credit.  *Id.* ¶ 38.  In doing so, the Company explained to Seyboldt that she was not considered an employee of the Company during that time frame.  *Id.*  Seyboldt claims that the March 2020 decision was the first time she had received notice of her rights to appeal the Company's decision and bring a lawsuit.  *Id.* ¶ 40.  Seyboldt, through counsel, then engaged in an internal appeal process culminating in a final decision by the Committee on October 15, 2020, which again denied Seyboldt's claim for benefits related to the time frame before her direct hire. *Id.* ¶¶ 41-58.

3. *Procedural History*

Seyboldt originally filed her complaint in the Western District of New York on October 14, 2022.  *See* Compl., Doc. No. 1.  After the parties stipulated to a transfer of venue and extension of the pleading deadlines, *see* doc. no. 14, the case was transferred to my docket on February 16, 2023.  *See* Doc. Nos. 16-17.  The Defendants filed a motion to dismiss the complaint on March 2, 2023.  *See* Doc. No. 27.  I held a hearing on February 29, 2024, at which I denied without prejudice the Defendant's motion to dismiss and ordered Seyboldt to file an amended complaint.  *See* Doc. No. 50.

Seyboldt filed her amended complaint, doc. no. 54, on April 15, 2024, asserting seven claims against three Defendants.  The Defendants filed a second motion to dismiss, doc. no. 57, on September 20, 2024.  Although I initially planned to hold a motion hearing in March 2025, I

5

cancelled that hearing after Seyboldt's counsel experienced significant health difficulties. Seyboldt's counsel ultimately passed away on May 28, 2025. The case sat in limbo for much of the last year, until Seyboldt secured new counsel. Seyboldt then filed a notice stating that she would not contest the dismissal of the Company as a defendant or the dismissal of Counts Four, Five, and Six against the remaining two Defendants. *See* Pl.'s Notice Re Defs.' Mot. to Dismiss, Doc. No. 72. This order will therefore only assess the remaining claims (Counts One, Two, Three, and Seven) asserted against the remaining two defendants.

## II.    Standard of Review

### A.  Rule 12(b)(6)

A motion to dismiss for failure to state a claim under Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether it is plausible that the plaintiff has a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly*

and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted).  Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

"[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion," a district court must either "exclude the additional material and decide the motion on the complaint alone" or "convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." *Fonte v. Bd. of Managers of Continental Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988).  However, a district court may consider certain materials without converting a motion to dismiss into one for summary judgment.  Those materials include matters of which judicial notice may be taken, *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in the complaint by reference, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citations omitted); or any document that is not attached or incorporated by reference "where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint," *id*. at 153 (citation and internal quotation marks omitted).

## III.    Discussion

### A.   Counts 1 and 7: Claims to Recover Benefits (ERISA § 502(a)(1)(B))

The Defendants argue that Seyboldt's first and seventh claims are barred by the six-year statute of limitations applicable to claims brought under ERISA § 502(a)(1)(B).  Seyboldt's first claim is to enforce the terms of the Plan (including that Seyboldt's benefits be calculated under

the legacy provisions) and to recover benefits due to her, and her seventh claim is for a declaratory judgment that she is entitled to benefits under the Plan from December 1999 to December 2023. *See* Am. Compl., Doc. No. 54, ¶¶ 71-82, 135-137. Seyboldt's first and seventh claims are both brought under ERISA § 502(a)(1)(B), which states that:

> [a] civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B). The Defendants argue that Seyboldt's claims for benefits and for declaratory relief regarding her entitlement to benefits are untimely. *See* Defs.' Mem. of Law in Supp. of Mot. to Dismiss, Doc. No. 57-1, at 10-14. In particular, they argue that section 502(a)(1)(B) claims must be brought within six years of "clear repudiation" by the plan of the plaintiff's entitlement to benefits, and "[Seyboldt] knew as early as 2004 [when she received the 2003 SPD], and certainly no later than March 2016 [when she inquired about the value of her pension benefits], that she was not eligible to participate in the Plan while she was employed by Kelly Services from 1999 through 2003." *Id*. at 10.

The Defendants are correct that the default statute of limitations for section 502(a)(1)(B) claims is six years from the date of either a plan's final denial of a participant's claim for benefits, or from a plan's "clear repudiation" of a claim for benefits. ERISA is silent regarding the statute of limitations for section 502(a)(1)(B) claims, and so courts borrow from the most nearly analogous state law doctrine—breach of contract—which in Connecticut has a six-year statute of limitations. *See Cole v. Travelers Ins. Co.*, 208 F. Supp. 2d 248, 253 (D. Conn. 2002); Conn. Gen. Stat. § 52-576(a) ("No action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues . . . ."). *See also Testa v. Becker,* 910 F.3d 677, 682 (2d Cir. 2018) ("An ERISA denial-of-benefits claim ordinarily accrues when a plan denies a beneficiary's formal application for benefits, but it

8

may also accrue upon a clear repudiation by the plan that is known, or should be known, to the plaintiff—regardless of whether the plaintiff has filed a formal application for benefits.") (cleaned up).  Seyboldt argues that her claims are nonetheless timely because her entitlement to benefits was not clearly repudiated until the Defendants' final denial of her appeal on October 15, 2020.  Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, Doc. No. 60, at 4-6.

Accepting Seyboldt's allegations as true, her claims under Counts One and Seven may be timely.  She argues that her receipt of the 2003 SPD could not have constituted a clear repudiation because the 2003 SPD mistakenly informed her that the Company's books and records decide whether one is an independent contractor *or* a leased employee, and that one can be characterized as a leased employee even if they are "considered to be a common law employee for other purposes."  *See* Pl.'s Supp. Br. in Opp'n to Defs.' Mot. to Dismiss, Doc. No. 69, at 5-6.  The 2003 SPD should have explained to Seyboldt that the Company's books and records only dictate whether one is an independent contractor, and that an assessment of whether one is a leased employee depends instead on the definition provided by section 2.5(d) of the Plan.

Seyboldt reasonably could have concluded—based on her reading of the 2003 SPD—that because the Company deemed her to be a leased employee, she had no claim to benefits for the services she provided from December 1998 to December 2023.  *See Heidgerd v. Olin Corp.*, 906 F.2d 903, 907 (2nd Cir. 1990) (explaining that SPDs serve as "an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary").  It was only in 2020, when the Company treated her email inquiry as a claim for benefits under the Plan, that she received a copy of the actual Plan, which informed her that common-law employees are participants.  Am. Compl., Doc. No. 54, ¶

108. Because the 2003 SPD miscommunicated important information to her—and she did not learn of that mistake until 2020—her receipt of the 2003 SPD cannot by itself be considered clear repudiation. In other words, it is plausible that Seyboldt did not know that she had a claim regarding her 1998-2003 service until she received the Plan, which communicated that common-law employees are eligible participants. *See Frommert v. Conkright*, 433 F.3d 254, 265 (2d Cir. 2006) (highlighting how the SPD plays a "central role … in communicating the terms of a plan to its members").

The Defendants alternatively argue that her receipt of the 2003 SPD must be considered clear repudiation because only participants in the Account-Based Design received the 2003 SPD, and only existing Plan participants——*i.e.*, those who were participants prior to the 2002 amendment—could affirmatively enroll in the Account-Based Design. Defs.' Mem. of Law in Supp. of Mot. to Dismiss, Doc. No. 57-1, at 11. Put differently, the Defendants assert that Seyboldt should have learned from the 2003 SPD that she was not a participant in the Plan prior to the 2002 amendment because she never had the option to select between the Account-Based Design and the legacy provisions.

The fact that existing Plan participants could choose between the Account-Based Design and the legacy provisions adds nothing to Defendants' argument that the 2003 SPD repudiated Seyboldt's entitlement to benefits. That choice was at best a round-about way of communicating what the Plan stated more directly—that leased employees were not entitled to benefits. Seyboldt could have reasonably concluded, based on the 2003 SPD's inaccurate information, that she was a leased employee and therefore excluded from the Plan. The 2003 SPD did not inform her that a common law employee was excluded from the definition of a leased employee and was, in fact, entitled to benefits.

10

The Defendants are correct in asserting that "an SPD can amount to a clear repudiation of benefits," *Testa*, 910 F.3d at 682, but the decisions they cite to involve SPDs that accurately summarize the Plan. *See, e.g.*, *Vollmer v. Xerox Corp.*, 2022 WL 446628 (W.D.N.Y. Feb. 14, 2022) ("Courts in this Circuit have routinely held that the distribution of an SPD that 'plainly and accurately' describes relevant amendments to a plan may constitute one such other form of a clear repudiation of benefits.") (quoting *Testa*, 910 F.3d at 682). The 2003 SPD, however, did not accurately inform Seyboldt of the distinction between common-law and leased employees. The 2003 SPD therefore did not "clearly and unequivocally repudiate[]" Seyboldt's claim for benefits. *Carey v. Int'l Broth. of Elec. Workers Local 363 Pension Plan*, 201 F.3d 44, 49 (2d Cir. 1999).

The March 2016 email sent by the Company's Human Resources Department to Seyboldt also does not necessarily constitute clear repudiation. The actual text of the email is not in the record, so I cannot take judicial notice of it. All I have is an excerpt of a letter sent by Seyboldt's previous counsel to the Company prior to the commencement of this case, which states:

> On or about March 2, 2016, Ms. Seyboldt emailed her HR manager, indicating that she believed her service from 1999-2003 should be counted in her service credit. Ms. Seyboldt was informed that she was not an employee of Praxair from 1999 through December 14, 2003 and, thus, she was not entitled to additional service credit.

Ex. K to Am. Compl., Doc. No. 54-11, at 2. The excerpt indicates that Seyboldt may have known as early as March 2016 that the Company did not consider her an "employee" from December 1999 to December 2003. For the email to constitute clear repudiation, it needs to have unequivocally informed Seyboldt that she did not qualify for pension benefits that she claims accrued between 1999 and 2003. *See Yuhas v. Provident Life and Cas. Ins. Co.*, 162 F. Supp. 2d 227, 232 (S.D.N.Y. Aug. 2, 2001). The Defendants cannot show clear repudiation merely by

11

citing to an ambiguous summary of an email when the actual text of the email is not before the court and the email may not be dealing with pension benefits in the first place.

Taking Seyboldt's allegations as true, I cannot conclude that either the 2003 SPD or the 2016 email sent to her by the Company constituted clear repudiation by the Plan. Without a finding of clear repudiation, the applicable statute of limitations is six years after Seyboldt received a final decision on her claim for benefits. The date on which Seyboldt's final decision was issued is October 15, 2020. Am. Compl., Doc. No. 54, ¶ 56. Seyboldt filed this suit on October 14, 2022, less than two years later. *See* Compl., Doc. No. 1.

Therefore, Defendants' Motion to Dismiss Counts One and Seven of Seyboldt's Amended Complaint is **DENIED**.

B. Count 2: Breach of Fiduciary Duties (ERISA § 502(a)(3))

The Defendants next move to dismiss Count Two of Seyboldt's Amended Complaint, which asserts a claim under ERISA § 502(a)(3)[3] for breach of fiduciary duties. *See* Am. Compl., Doc. No. 54, ¶¶ 83-97. Count Two challenges the Plan's failure to recognize Seyboldt as a participant before 2003, as well as the Plan's subsequent failure to calculate Seyboldt's benefits under the legacy provisions. *See id*. Seyboldt seeks equitable relief under Count Two. *Id*. ¶ 97.

The Defendants make two separate arguments for why Count Two should be dismissed: (1) that it is barred by ERISA's six-year statute of repose for fiduciary breach claims; and (2) that it is duplicative of her claims for benefits under section 501(a)(1)(B). *See* Defs.' Mem. of Law in Supp. of Mot. to Dismiss, Doc. No. 57-1, at 15-19.

---

[3] ERISA § 502(a)(3) creates a cause of action to obtain "other appropriate equitable relief" for violation of a term of a benefits plan. 29 U.S.C. § 1132(a)(3) ("A civil action may be brought--by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.").

The second argument made by the Defendants can easily be rejected. At the motion to dismiss stage, Seyboldt's breach of fiduciary duties claims should not be dismissed even if they may prove to be duplicative of her claims for benefits due under ERISA § 502(a)(1)(B).[4] The Defendants are correct that courts generally should refuse to award equitable relief for breach of fiduciary duties claims under section 502(a)(3) where "other adequate relief" is available under the statute. *See Varity Corp. v. Howe,* 516 U.S. 489, 515 (1996) (explaining that because ERISA authorizes "*appropriate* equitable relief" for breaches of fiduciary duties, "we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'"). However, "at the motion to dismiss phase, courts generally allow a party to pursue claims under both ERISA §§ 502(a)(1) and 502(a)(3), because it is not yet clear that monetary benefits under section 502(a)(1)(B) will provide plaintiffs with a sufficient remedy." *Negron v. Cigna Health & Life Ins.*, 300 F. Supp. 3d 341, 362 (D. Conn. 2018) (citing *New York State Psychiatric Ass'n v. UnitedHealth Group*, 798 F.3d 125, 134 (2d Cir. 2015)). Therefore, the Defendants' argument regarding the duplicative nature of Seyboldt's fiduciary breach claims is premature.

The Defendants also argue that Seyboldt's second claim should be dismissed because it is barred by ERISA's six-year statute of repose for claims for breach of fiduciary duties claims. Section 413 of ERISA states:

---

[4] In response to the Defendants' argument that Count Two is duplicative of Counts One and Seven, Seyboldt contends that Count Two "alleges distinct injuries and seeks alternative relief" by focusing on how Defendants' actions "resulted in her inability to either pursue her benefits claim in a timely manner or qualify for legacy benefits due to delayed processing of her participation status." Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, Doc. No. 60, at 19.

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the **earlier of**—
>
> **(1)** six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>
> **(2)** three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113 (emphasis added).  The Supreme Court in *California Public Employees Retirement System v. ANZ Sec., Inc.* held that section 413(1) is a statute of repose, meaning that it is an absolute bar to liability for a defendant after an explicit and certain time period.  582 U.S. 497, 504-05 (2017).  By contrast, section 413(2) is a statute of limitations, which begins to run when the plaintiff gains "actual knowledge" of the breach.  *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 181 (2020).

The Defendants argue that Seyboldt's fiduciary breach claim should be dismissed as untimely under section 413(1).  Defs.' Mem. of Law in Supp. of Mot. to Dismiss, Doc. No. 57-1, at 16.  Accepting Seyboldt's argument about when she gained "actual knowledge" of the Defendants' breaches—May 2020—her claims would be timely under section 413(2) because they were brought in 2022—within three years of that date.  *See* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, Doc. No. 60, at 26.  However, Seyboldt's claims would *also* have to satisfy the requirements of either section 413(1)(A) or (B), because the statute states "[n]o action may be commenced after the *earlier of*" the circumstances described in sections 413(1) and 413(2).  29 U.S.C. § 1113 (emphasis added).  The Defendants argue that Seyboldt's claims are not timely under section 413(1) because her allegation that Defendants "fail[ed] to recognize her as a [Plan] participant between December 1999 and December 2003" would constitute an

14

affirmative act under section 413(1)(A), and the alleged breach occurred in December 2003, more than 18 years before she brought her claims. Defs.' Mem. of Law in Supp. of Mot. to Dismiss, Doc. No. 57-1, at 16. In contrast, Seyboldt argues that the Defendants' failure constitutes an "omission" under section 413(1)(B) and that Count Two is timely because the Defendants can still cure the breach before Seyboldt retires and receives pension benefits. Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, Doc. No. 60, at 23-24.

Count Two is timely regardless of whether Defendants' failure to recognize her as a Plan participant is considered an affirmative act or an omission. If Defendants' failure is characterized as an omission, the focus turns to "the latest date on which the fiduciary could have cured the breach or violation." 29 U.S.C. § 1113(1)(B). As the Defendants point out, cure "means to rectify an omission before its effects are felt, not to remedy it after it has already caused injury." Defs.' Mem. of Law in Supp. of Mot. to Dismiss, Doc. No. 57-1, at 16 (quoting *Dooley v. UFCW Int'l Pension Plan for Emps.*, 2023 WL 2139200, at *5 (D.D.C. Feb. 21, 2023)). Seyboldt alleges in Count Two that her injury is the difference between the pension benefits that she would have received under the legacy provisions and the pension benefits that she is expected to receive under the Account-Based Design. Am. Compl., Doc. No. 54, ¶ 96. That injury is forward-looking; as an active employee, Seyboldt has not yet received any pension benefits and will not experience the alleged injury until she retires. *See, e.g.*, *Vollmer*, 2022 WL 446628, at *6 (concluding that plaintiffs' retirement date was the last possible day to cure); *see also Grosso v. AT&T Pension Benefit Plan*, 2022 WL 2533000, at *3 (S.D.N.Y. July 7, 2022) ("[T]he statute runs from when each Plaintiff turned fifty-five years old, which was the earliest possible date Plaintiffs could have made a written application to trigger their entitlement to

15

unreduced benefits[.]").  That means that Defendants can still cure the breach.  Count Two is therefore timely if Defendants' failure is characterized as an omission.

If Defendants' failure is characterized as an affirmative act, I must look to "the date of the last action which constituted a part of the breach or violation."  29 U.S.C. § 1113(1)(A).  The Defendants claim that the last alleged action that was a part of the breach either took place in December 1999, when they denied her ability to participate in the legacy provisions, or in December 2003, when they placed Seyboldt in the Account-Based Design without affording her an opportunity to select from the legacy provisions.  Defs.' Reply in Supp. of Defs.' Mot. to Dismiss, Doc. No. 61, at 8.   The Defendants' alleged breach of their fiduciary duties, however, was not a one-off that ended some time ago.  Rather, the alleged breach is ongoing, because the Defendants still do not recognize Seyboldt's service from December 1999 to December 2003.  Even if the breach were not ongoing, Defendants fail to explain why the date they denied Seyboldt's claim for benefits would not count as the last action.  That act occurred on October 15, 2020, and Seyboldt filed her suit on October 14, 2022, which falls within the six-year period outlined in section 413(1)(A).

Therefore, Count Two is timely, whether it is characterized as an affirmative act or omission.  Defendants' motion to dismiss Count Two of Seyboldt's Amended Complaint is **DENIED**.

C.  Count 3: Failure to Provide Accurate Summary Plan Description (ERISA § 102)

In her third claim, Seyboldt alleges that the Defendants failed to provide her with an accurate summary of her rights and benefits under the Plan, in violation of ERISA § 102, 29 U.S.C. § 1022.  Am. Compl., Doc. No. 54, ¶¶ 98-110.  In particular, she argues that the 2003 SPD that she received upon her direct hire in December 2003 misleadingly informed her that an individual is "not eligible to participate in the Plan if [they] are . . . characterized as a leased

16

employee or independent contractor on Praxair's books[.]" *Id.* ¶¶ 100-01.  As she points out, "the terms of the Plan do not exclude individuals who are merely characterized as leased employees on Defendants' books, but instead only excludes those individuals who are not common law employees of Linde." *Id.* ¶ 101.  Therefore, she claims that the 2003 SPD "contained materially false and misleading statements as to who is eligible and ineligible to participate in the Plan," which prevented her from knowing that she had a claim for benefits prior to May 7, 2020, when the Company provided her with a copy of the Plan for the first time. *Id.* ¶¶ 104-09.

Section 102 of ERISA requires an SPD to be provided to participants and beneficiaries of a covered pension plan, and for the SPD to be "written in a manner calculated to be understood by the average plan participant." 29 U.S.C § 1022(a).  The SPD must also be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." *Id*.  That means that it should include an accurate summary of "the plan's requirements respecting eligibility for participation and benefits." *Id*. § 1022(b).

ERISA "contemplates that the summary [plan description] will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary." *Heidgerd*, 906 F.2d at 907.  The Defendants argue that Seyboldt's third claim fails as a matter of law because "[a]bsolute precision is not the standard," and the Court should therefore "forgive any minor differences in wording between the Plan and the SPD." *See* Defs.' Mem. of Law in Supp. of Mot. to Dismiss, Doc. No. 57-1, at 21 (citing *Robinson v. Sheet Metal Workers' Nat.'l Pension Fund, Plan A,* 441 F. Supp. 2d 405, 437 (D.

17

Conn. 2006), which held that although the use of a specific term was "not ideal," it was not misleading when read in context of the SPD's discussion of that term).

The specific provision of the Plan that Seyboldt alleges was inaccurately summarized in the 2003 SPD is section 2.5, which describes those individuals who are excluded from participating in the plan. It reads, in relevant part:

> The following individuals are not eligible to participate in the Plan:
>
> > (d) Individuals who perform services for an Employer as Leased Employees. For purposes of this Subsection (d), the term "Leased Employee" shall mean any person (other than an Employee of the Employer):
> > > (i) who, pursuant to an agreement between an Employer and any other person (the "leasing organization"), has performed services for an Employer (or for an Employer and related persons determined in accordance with Code Section 414(n)) on a substantially full-time basis for a period of at least one year if such services are performed under the primary direction or control of an Employer;
> > > (ii) is not a participant in a qualified money purchase plan maintained by the leasing organization which provides for a nonintegrated employer contribution of at least 10 percent of such person's annual compensation and provides for immediate participation and full and immediate vesting; and
> > > (iii) meets other requirements as may be set forth in Code section 414(n);
> > (e) Individuals (if any) who are considered by an Employer to be independent contractors, but who may be determined for any other purpose to be employees of an Employer. The characterization on the books and records of an Employer of the relationship of the individual and an Employer (if any) shall be conclusive of the individual's status for purposes of the Plan;

Ex. A to Am. Compl., Doc. No. 54-1, at 24-25. The 2003 SPD summarizes that provision of the Plan by stating:

> Even if you work more than 50% of the set hours at your location, you are not eligible to participate in the Plan if you are:
> - A member of a bargaining unit with a collective bargaining agreement—unless the agreement specifically provides for participation in the Plan.
> - Hired outside the United States for foreign employment, or if you continue to participate in a foreign subsidiary's pension plan while working in the United States.

18

- Characterized as a leased employee or an independent contractor on Praxair's books. For this purpose, the characterization is conclusive, even if you are considered to be a common law employee for other purposes.

Ex. C to Am. Compl., Doc. No. 54-3, at 2.

Seyboldt argues that the 2003 SPD is inaccurate because it states that the Company's books and records conclusively decide whether one qualifies as a "leased employee" under the Plan. Am. Compl., Doc. No. 54, at 100-01. She points to the Plan's exclusion of "common law employees" from the definition of "leased employees" in support of her claim. *See* Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, Doc. No. 60, at 16 ("Both the Plan document and 26 U.S.C. § 414(n)(2) are unambiguous in that they provide objective criteria for establishing that a leased employee is someone who is *not* a common-law employee of the recipient.").

Seyboldt plausibly claims that the 2003 SPD inaccurately summarized the Plan's eligibility criteria. Section 2.5(d) of the Plan defines "leased employee" as a person "[o]ther than an Employee of the Employer," and section 2.5(d)(iii) incorporates into the definition of "Employee" the description contained in 26 U.S.C. § 3121, which in subsection (d)(2) defines "employee" as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." Ex. A to Am. Compl., Doc. No. 54-1, at 24-25; 26 U.S.C. § 3121(d)(2). According to the terms of the Plan, then, if an individual is determined to be a common-law employee of the Company, they cannot also be a "leased employee." Although the 2003 SPD uses the phrase, "[t]he characterization on the books and records of an Employer" to explain how to assess whether one is leased employee, the use of that phrase in section 2.5(e) applies only to "independent contractors." *Id*. at 25.

Seyboldt asserts that she read and relied on the 2003 SPD upon her direct hire by the Company. *See* Am. Compl., Doc. No. 54, ¶¶ 102-04, 109 (alleging that the Defendants

"distributed the 2003 SPD to Plaintiff," that Seyboldt "read all materials provided to her by Defendants at all times since she began working in 1999, and that "[h]ad [she] been provided . . . accurate Plan documents . . . she would have pursued [] claims at that time."). She also alleges that she did not learn of the accurate definition of "leased employees" until May 7, 2020, when the Company provided her with a copy of the Plan. *Id*. ¶ 108. Accepting the facts alleged in the Amended Complaint as true, I conclude that Seyboldt has adequately pled that the 2003 SPD did not provide her with information that is "sufficiently accurate and comprehensive to reasonably apprise [her] of [her] rights and obligations under the plan[.]" 29 U.S.C. § 1022(a). The inconsistency in how the 2003 SPD and the Plan define "leased employee" is not, as Defendants suggest, "at most a distinction without a difference." Defs.' Mem. of Law in Supp. of Mot. to Dismiss, Doc. No. 57-1, at 21. The definition provided by the 2003 SPD could reasonably lead an individual to believe that they are a leased employee as long as the Company says so, even if that individual is otherwise a common-law employee. That interpretation, however, is incorrect under both the law and the terms of the Plan, *see Schultz v. Stoner*, 2009 WL 455163, at *13 (S.D.N.Y. Feb. 24, 2009), and so Seyboldt may have justifiably been confused by the 2003 SPD's representation of the Plan's eligibility requirements.

Therefore, the Defendants' motion to dismiss Count Three of Seyboldt's Amended Complaint is **DENIED**.

## IV.     Conclusion

For the foregoing reasons, Counts Four, Five, and Six of Plaintiff's Amended Complaint are **DISMISSED**. Linde, Inc. is also **DISMISSED** as a defendant in this case.

The Defendants' Motion to Dismiss, Doc. No. 57, regarding the remaining counts is **DENIED**. Counts One, Two, Three, and Seven of Seyboldt's Amended Complaint will proceed

against Defendants Linde U.S. Pension Plan and the Administration and Investment Committee

for the Linde U.S. Retirement Plans.

SO ORDERED at Bridgeport, Connecticut this 20th day of March, 2026.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

21